## Denton v. Commonwealth.

(Decided May 4, 1920.)

### Appeal from Carlisle Circuit Court.

1. Criminal Law—Circumstantial Evidence—Sufficiency.—Where the evidence is wholly circumstantial and may reasonably be reconciled with the innocence of the defendant, a verdict of conviction will not be sustained.

2. Criminal Law—Character—Evidence as to Character.—A defendant's good character is always admissible in his favor, and where the evidence for the Commonwealth is wholly circumstantial and defendant offers to prove his good moral character, he should be allowed to do so even though he has been permitted to prove his good reputation for peace and quietude, in a homicide case.

JOHN E. KANE for appellant.

CHARLES I. DAWSON, Attorney General, and BEN S. ADAMS for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

Appellant, Frank Denton, who was convicted in the Carlisle circuit court of the crime of murder, appeals to this court seeking a reversal of the judgment on the grounds, (1) insufficiency of evidence to support the verdict; (2) incompetent evidence admitted against him and competent evidence for him rejected by the trial court; (3) erroneous instructions; (4) a verdict of guilt by a jury in another case growing out of the charge against Denton, was read in the presence and hearing of the jury trying appellant.

After going over the record carefully, we are convinced that if appellant is entitled to a reversal, it is upon the ground that the verdict is not supported by sufficient evidence, although the record is not free from errors of less importance. The evidence introduced by the Commonwealth was circumstantial, as will be seen from a brief statement of the facts:

Denton, the owner of a farm, lived several miles from the town of Bardwell, in Carlisle county. In the early spring of 1919 he entered into a rental contract with John Clark whereby Clark and his family were to move on to Denton's lands and occupy a small tenant house; Clark was to make a crop, and work for Denton when he was not otherwise engaged. The Clark family were

very poor people, but the worst thing about them was an unsavory reputation. They had not lived in the community of Denton's farm for some time, if at all before. Clark had a brother, William Clark, who lived very near. He was paralyzed. Very soon after John Clark and his family moved on to the Denton farm the neighbors began to make complaint concerning the conduct of the family, composed of the wife and grown daughter, and one night some unknown persons threw rocks against the house in an endeavor to frighten the Clark women away from home and to drive them from the community, as it was generally supposed, by the people in that neighborhood. John Clark and his wife did not get along well together, and she would not let him stay at home at night; most of the time, when he was not at work on the farm, he spent at his brother William Clark's; in this he was controlled in part by two reasons; one, he could not stay at home in peace and the other, his sick brother needed attention. He would sit up part of the night with him. Appellant Denton also was a frequent visitor at the sick man's house and assisted in sitting up at night and waiting on him. Clark and appellant Denton got along fine, but the complaint of the neighbors against the family induced appellant Denton to talk to the women about their conduct and to urge them to allow John, the husband, to remain at home at night. About two weeks after the rocks were thrown against the house, as stated, another assault was made on the house about dark along in April, and rocks were again thrown on the house and some kind of explosives were placed under the house and two shots from a large pistol or gun were fired through the house, one of the shots striking Ola Clark, the daughter, in the head and killing her; the other bullet lodged in the headboard of a wooden bedstead in the house. The husband, John Clark, as shown, was at his brother's house, and appellant Denton was either at the William Clark home at the time the shots were fired, or entered the house very soon thereafter. Mrs. John Clark, shortly after the homicide, ran out to the house of a colored man and gave the alarm; the sheriff and the other officers came out from the county seat to investigate the matter and in doing so, called on a number of the neighbors, including appellant Denton, who was in bed apparently asleep at the time they went to his house. It appears that John Clark

did not learn of the death of his daughter until after the officers came out from town and carried the news to him. Appellant Denton also claims he first received news of the death of Ola Clark through the sheriff. A coroner's inquest was had and other investigations made, but appellant was not arrested and charged with the murder until several days had elapsed. In the meantime suspicion had rested on the father, John Clark, Denton and others.

The evidence relied upon by the Commonwealth to sustain the verdict is as follows:

The witness John Clark testified as follows:

"Q. Was anything said there about getting blood-hounds? A. Yes, sir. Q. Who spoke of it? A. Several talking and every time we say anything about it Frank would say we don't need them, we have been tramping around the house and we don't need them, that is what he would say every time we would say anything about it, that we didn't need those hounds. . . . Q. Did he (Denton) come back and say anything about the women folks being there at the house? A. Not that evening. Q. Did he at any time make any statement? A. What he said to me he said one time that was before this occurred, he said you will have to get them women out of there, they are bawling me out and I am not going to stand it. Q. Told you to get them out they were bawling him out and he wasn't going to stand it? A. Yes, sir. . . . Q. I will hand you a pistol and ask you to examine it? A. I couldn't tell, but I can tell one thing, that is the pistol I had in my hand and went down there when he throwed in, I thought it was him throwed in that night, somebody did, he gave me this pistol, told me to go by and tell his wife to give it to me and I took it in my hands and she loaded it all the way around and I went to Mr. Tucker's, my wife gone up there. Q. Whose pistol is that? A. Frank Denton's."

Mollie Clark testified and from her testimony we glean the follownig:

". . . Q. What caused you to be afraid of any one hurting you? A. Because there were threats made. . . . Q. Just tell this jury what you first heard before these shots were fired if anything? A. That night? Q. Yes, that night. A. Yes, sir; well that threats made that evening between three and four o'clock Mr. Denton who walked up to that porch, we had been off to Berkley

visiting and we came back and he walked up and said, I suppose you have come back here again. Q. What Mr. Denton was that? A. Mr. Frank Denton, well, he says I thought you got you a place and I said no, not for certain, but we had to come home to tend to our chickens and he says, well, are you going to stay here tonight and I says well, I guess we will, we are tired we had the mud from Berkley, little this side of Berkley on home, and well, he says, if you stay here tonight you won't stay here any longer, says I; Ola, my daughter says, here Mr. Denton; he says that there is more will be done to the house than has been; well, she says, I am not feeling good, I am sick, not able to go away I am worried, walked and tired and,—Well, he says you are going to stay here tonight and she says I guess so, if I feel like it I will go to Mr. Tucker's or uncle Bill's, and she didn't feel like going and we locked the door on the outside and said we wouldn't light a lamp fear some one might be watching and we will make them think we are not at home and maybe they won't hurt us. . . . Q. I am asking you what was said between you and your daughter and Frank Denton that afternoon? A. He said if you stay here 'airy' nother night or tonight there will be more done than was, and hell will be shot out of this house and you and your mamma will sauce your daddy and me no more after tonight; she said, I says, if they kill me I can't help it, I can't go away from home tonight, I am sick then he turns around and says if 'airy' one of you should be living in the morning would you think I done it, I said if I am spared to live I will think you done it and she said if I am spared I will say you done it for I have been afraid of you a week. . . ."

Concerning what took place after the homicide, Mrs. Clark said:

"Q. Mrs. Clark did you see what direction these folks went away from there? A. It was dark, I could only tell the noise. What direction were they in? A. Kindly in like going up that way. Q. Who lived up that way? That is, I reckon north, towards Denton's house. Q. Who lived up that way? A. Mr. Frank Denton was the next house from us that way towards Bardwell."

Mrs. Lucy Clark testified for the Commonwealth as to the time Mr. Denton came to the William Clark home that night and his manner:

"Q. You say Mr. Denton came in about eight o'clock or close to it? A. Yes, sir. . . . Q. Did you before Frank Denton came in that night, did you hear any noise or report out doors? A. Yes, sir; I heard I thought it was torpedoes on the railroad, and I suppose it was and I heard some one make one scream, and I said John hush, all of you I hear something. Q. You heard a pistol and thought you heard somebody scream? A. Yes, sir. Q. How many shots you think were fired? A. I didn't hear but two. . . . Q. Well, now was that before Frank Denton came to your house? A. About fifteen or twenty minutes, I suppose, such a matter, might have been rather longer, I know it wasn't any shorter. . . . Q. Mrs. Clark, you observe anything wrong with his actions or demeanor or countenance? A. Yes, sir; I seen there was something wrong with Mr. Denton. Q. Tell the jury your observation of him at that time? A. I thought there was some changes, his voice trembled and he didn't look right, he had changed his color and his face was changed from what I had seen him before, but still I didn't say anything to him."

The Commonwealth also introduced Mr. B. P. Edrington, sheriff, who testified in part as follows:

"Mr. Edrington, you go to Frank Denton's next morning? Yes, sir. Q. You see his gun there at his house? A. Yes, sir; went in and called for it. Q. I will now hand you a gun and ask you to examine it and state if you ever seen that gun before? A. Well, that is the gun, I think that is the one his wife gave us that morning. Q. Mrs. Frank Denton gave that gun to you next morning? A. Yes, sir. Q. What calliber gun was that she gave you? A. I judge from the looks, I never saw the marks, it is a forty-four, judge from looking at it. . . . Q. Tell the jury whether or not what you saw in that gun barrel that morning that gun barrel, the rifles of it, when you examined it? A. Well, we carried the gun out, I did, out to the hall on the front porch, and looked through it and my experience and what I deal with mine, the gun had evidently been shot recently. . . . Q. What did you base your belief on that the gun had been recently shot? A. When recently shot that burnt powder in there is loose and black, and after that gun stands a few—leave it as long as three or four days the whiter that powder will get caked on the barrel and will get so hard you can't get it off, but in this gun it

was perfectly black and loose. . . . Q. Mr. Edrington who did you get to stay with the corpse that night? A. I got Mr. Ules Mix and Mr. Denton. Q. If anything, what did Mr. Denton say about staying there that night? A. Well, there was no one else to stay; I had to come back to town to see what the coroner was going to do, we had done all we could do, I told Mix and Mr. Denton, those other boys left or told us they were going, I asked Mr. Mix if he would stay and he said he would and asked Mr. Denton to stay and he said he was needed at home and I told him it would be a case of have to, I couldn't leave the corpse there alone, it was my duty to get somebody to stay there before I left, no telling what might happen, light burning, go off and and leave it alone there and me come back to town without putting somebody in charge until I could get back, he rather insisted that I get somebody else and I told him he would have to stay there, there was nobody else. . . . Q. You left the pistol there, you didn't finally take the pistol until the following Saturday did you? A. No, sir; I got the gun when I went after Mr. Denton. Q. The gun was turned over to you readily? A. Yes, sir. Q. The gun was exhibited to you freely first time you went up there? A. Yes, sir; wife went and got it and unloaded it, I don't know whether she gave it to me or Mr. Shelbourne or Mr. Riggs, two or three of us. Q. Did you hear anything said about getting some bloodhounds there that night or next morning in the presence of Mr. Denton? A. When I sent to Mrs. Clark and had her brought there that night she was sitting in the buggy crying and taking on and that is all she would talk about, getting the dogs to see who did this, Mr. Denton made the remark there he didn't see that would do any good.''

With reference to the caliber of the gun and its appearance, Mr. Roy M. Shelbourne, county attorney, testified as follows:

''Q. Did you go over to Frank Denton's house and see a pistol? A. I did. Q. Is this the pistol that he has been exhibiting here? A. It is. Q. What number caliber of gun is that? A. Forty-four. Q. Did you look through the rifle barrel of that gun that morning? A. Yes, sir. Q. Tell the jury what you could see in that gun there from your observation and experience how recently had that gun been shot? A. Well, I am not an expert in the use of firearms but I have hunted with shotguns and

discharged a pistol. . . . Q. Have you had any ex-
perience? A. I have had some. Q. In your experience,
what did you in your knowledge. . . . From what
you saw there state how recently it had been shot if it
had been shot? . . . A. In my judgment it had
within two weeks of the time I was out there. Q. What
could you see inside of the gun barrel? A. Well, I could
see the remains of the powder, it was black and done
turned black and you could smell the powder burn about
the gun, what I call powder about a gun.''

Mr. Ed. Riggs, testifying upon the same subject, said
in part:

''Q. Did you go by Frank Denton's and see a pistol
that morning? A. I came back from there, as we came
from there. Q. You see a pistol there that morning?
A. I did. . . . Q. Was it the same pistol that Mr.
Shelbourne and Mr. Edrington looked at? A. It was.
Q. You look in that pistol barrel? A. Yes, I did. . . .
Q. Describe to the jury the appearance of that pistol
barrel what you saw in it? A. Well, I looked through
it, it seemed to be dirty and black in there like it might
have had some powder or something in there. Q. Did
you smell anything about the gun? A. Well, I tried to
but couldn't, I smelled of it but didn't smell any powder,
one of them asked me if I could smell the powder but
I did not.''

Also Charles Witty testified concerning the condi-
tion of the pistol, as follows:

''Q. Mr. Witty, you see a gun that was had at the time
of the examining trial of Frank Denton here before the
county judge? A. Yes, sir. Q. You know whether that
is the same gun or not? A. No, sir; I do not. Q. Well,
did you examine that gun on that date? A. Yes, sir.
Q. What did you find from your examination of the
barrel of it? A. Well, if I remember right, the muzzle of
the gun was dry and up in the barrel was still wet. Q.
From what? A. From using it I suppose. Q. Shooting
it? A. Yes, sir. . . . Q. Can you state whether or
not that gun had been recently fired? . . . A. I
think it had. Q. Now what color was that substance in
it Mr. Witty? A. It was black on the barrel and little
white in the muzzle.''

This in brief is all of the evidence introduced by the
Commonwealth which tends in any measure to support

the charge in the indictment. On the other hand there is much evidence which supports his plea of not guilty. There is no motive shown for the killing unless this evidence reveals it, and there is no evidence that is not entirely consistent with the innocence of appellant, unless contained in the foregoing extracts. All the things charged against appellant may well have happened just as related, and yet appellant be innocent of the charge against him. Some one committed a horrible crime in shooting Ola Clark, but it would be a travesty on justice to permit a man whose reputation is proven to be good and whose past life is unstained, so far as this record shows, to be confined in the penitentiary for life on such intangible and wholly unsatisfactory evidence as produced by the Commonwealth. It is true that the sheriff and one or more of his deputies say that when they examined the pistol at the house of appellant they smelled, or thought they smelled burnt powder and they thought the pistol had been fired shortly before they made the examination, but how shortly before that time they were unable to state. If it be true that the pistol had been fired shortly before the sheriff made the examination this does not prove appellant guilty, because, as the evidence clearly shows, his wife had loaned the pistol to John Clark some nights before and he kept it a day or more, and it may be, so far as the evidence shows, that other persons also had handled the pistol. Other witnesses who examined the pistol at the same time the sheriff examined it say there was no smell of powder about it and say also that it had not been fired for some time, because in the barrel were cobwebs and white dust, indicating the gun had not been in use for some time.

The Commonwealth relied largely for its conviction upon the fact that at the house of Denton was this large forty-four caliber pistol, and the further fact the ball which struck and killed Ola Clark was of a large caliber. Denton did not own the pistol but it was the property of his wife, given to her by her father, Judge Hutson, some years before and kept about the house for the protection of the family. There is no accusation of Denton carrying or using the pistol unless he did so on the night in question. The mere fact that there was a pistol of large caliber in the house of appellant is no evidence whatever that he did the killing, because it is not infrequent that good, law abiding citizens have a large caliber pistol in

their house. There was no concealment of the pistol by the Dentons. When the sheriff asked to see the pistol the next day after the homicide Mrs. Denton unhesitatingly brought it out and exhibited it. There was nothing about the pistol to indicate it had been fired unless it was the smell of burnt powder or the filose indicated that a bullet had passed through, because there were no empty shells found either on the ground or in connection with the pistol.

So far as the evidence shows appellant Denton, when found by the sheriff, was at home sound asleep. He went directly from William Clark's back to his house and went to bed on the night of the killing, not knowing of the death of Ola Clark until some hours later. His evidence does not read like that of a guilty man. All evidence against him that appears incriminating is contradicted, and all the fragments of evidence offered by the Commonwealth which tends to support the charge in the indictment are not sufficient, when taken together, to support the verdict.

Appellant insists that the court erred to his prejudice in refusing to allow him to prove his good moral character although the court did allow him to prove his good character for peace and quietude. It is a generally recognized rule that the accused may himself invoke his good character as tending to disprove his guilt. 1 Greenleaf, p. 39.

The defendant's character, as indicating his probability of doing or not doing the act charged, is essentially relevant.

A defendant's good character is always admissible in his favor. 1st Wigmore, page 123.

This rule is of comparatively recent origin, but evidence of good character on the part of the defendant is regarded and received as substantive evidence and not merely collateral; especially is this true in cases where the evidence is circumstantial. Of course where the evidence is direct and certain the evidence of good character of the defendant would have little relevancy or importance, but in a case like the one at bar, where the defendant is accused of a heinous crime, and the only evidence offered against him, in addition to being fragmentary and circumstantial, is unsatisfactory and not altogether convincing, the good character of the defendant both for morality and for peace and good order, ought to

weigh much in his favor. At least evidence of his good character for peace and quietude and for morality should go to the jury, if offered by him, to be considered along with other substantive evidence in his favor. Of course when he opens the question of his character, the Commonwealth has the right to assail it by calling witnesses to prove his bad character, but this it did not do and perhaps was unable to do so. The rule in Kentucky is partly stated in White v. Comlth., 80 Ky. 480, and in Combs v. Comlth., 160 Ky. 386, and Allen v. Comlth., 134 Ky. 110. Until the defendant opens the question of his moral character, it cannot be assailed by the Commonwealth, but as soon as he offers himself as a witness and testified in his own behalf he may be impeached by the Commonwealth as any other witness.

This does not include the right to assail his general moral character but only his character for truth and veracity.

Ordinarily we would not attach much importance to the refusal of the court to allow defendant to prove his good reputation for morality, but in a case where the evidence is so unsatisfactory as this one, where the evidence for the Commonwealth is wholly circumstantial, evidence of good character of the defendant might have weight to turn the scales in his favor. At any rate, he was entitled to show his good moral character as well as his character for peace and quietude, and the court erred to his prejudice in failing to allow him to do so.

Appellant also complains that the trial court refused to allow him to impeach the witness, John Clark, who testified for the Commonwealth, by showing that Clark on different occasions after the homicide and before the trial had made statements exculpating appellant, whereas on the trial he testified to quite a different state of facts, and when asked about those exculpatory statements, denied making them. Appellant called witnesses to show that the witness John Clark had made such statements, but the Commonwealth objected to the questions and the court sustained the objection and declined to allow the witness to answer. Appellant avowed that the witness would answer that Clark had made the statements. These questions and answers are as follows:

"Q. Just after the trial (examining trial) John Clark have a conversation with you out near the front door of the court house?

"A. Yes, sir. Q. Tell the jury whether or not on that occasion he said that they had the wrong man, that Frank Denton did not do the killing?"

Objection by the Commonwealth.

Sustained by the court.

Avowal that the witness if permitted to answer, would state that he did.

"Q. Did John Clark have a further conversation with you on Monday last on the public road between Jesse Crawford's and his home? A. Yes, sir. Q. State whether or not he told you on that occasion that Mr. Frank Denton did not do the killing?"

Objection by Commonwealth.

Sustained by the court.

Exception by defendant and avowed that if the witness were permitted to answer his answer be that he made these statements to him.

Each of these questions was asked of the witness John Clark while on the stand testifying for the Commonwealth, and he denied making the statements. These questions only called for the opinion of Clark as expressed to the witnesses, and for this reason, if for no other, were incompetent. Moreover, the contradiction was on a collateral matter brought out by defendant, and therefore incompetent.

opinion.

Judgment reversed for new trial consistent with this opinion.