## Picklesimer v. Commonwealth.

(Decided January 18, 1927.)

### Appeal from Floyd Circuit Court.

1. Homicide—Evidence of Defendant's Reputation for Peace and Quietude is Admissible in Homicide Case.—In homicide cases, defendant may introduce evidence as to his good reputation for peace and quietude.

2. Homicide—Excluding Evidence of Defendant's Good Reputation for Peace and Quietude Held Reversible Error Under Circumstances.—Refusal, in murder prosecution, to permit defendant to introduce evidence as to his good reputation for peace and quietude, held reversible error, in view of circumstances.

H. H. RAMEY and T. J. ARNETT for appellant.

FRANK E. DAUGHERTY, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS— Reversing.

Appellant, Henry Picklesimer, was indicted and tried for the murder of his father, Jesse Picklesimer. He was convicted of manslaughter and sentenced to fifteen years in the penitentiary.

Appellant and his father with their respective families lived as tenants on the same farm. It appears that some years ago deceased deserted his wife, the mother of appellant, and consorted with another woman; that later a divorce was procured and he married his paramour, who at the time had several illegitimate chil-

dren; one of them, Easter, is now grown. Appellant seemed to have been on friendly terms with his father and family, but some friction existed between the latter and appellant's wife. The well at deceased's residence was dry and he procured his water for household purposes at appellant's well, which was located near the residence. Appellant, who is a miner by occupation, came home early on the afternoon of the homicide, which occurred on the evening of the 21st of June, 1925. Shortly afterwards the deceased and his step-daughter, Easter, came to the well to get water. Appellant and his wife were seated on the porch, but neither of the parties spoke. Later appellant claims that he and his wife went up the hollow above the house to look at a patch of corn that he was raising and which was being injured by ground hogs, carrying a pistol with him for the purpose of shooting any of these that he might see. On the way they met Easter, and appellant's wife gave her a note to give deceased, asking him not to come back for water unless he was willing to speak to her. Easter did not deliver this note. In the meantime the deceased had gone for his cows, which were in a pasture on the opposite side of the hollow from appellant's corn field, and the two met at a fence between the pasture of deceased and appellant's field. What there occurred is in dispute. Cynthia, wife of deceased, who was 260 feet away from the parties, and Easter who was nearer, testify that appellant's wife began the altercation by referring to the note which she said Easter had torn up; that deceased asked her what was in it, and she told him it was for him not to come back for any more water; that deceased told her he would have to have water, the law would give it to him; that she called him a damned son-of-a-bitch, and that Henry Pickelseimer pulled a pistol out from under his coat and shot deceased, producing his death; that Henry had not worn his coat that day before he started up the branch. This version is corroborated by two small step-children of deceased who were some distance away.

On the other hand defendant testifies that after giving the note to Easter, he and his wife met his father, who did not speak but passed by and held a whispered conversation with Easter; that deceased went up the hollow and around the fence and came back, meeting them at the fence; that when they met his wife referred to the

note and deceased asked her what was in it; that she told him, and that he jumped and grabbed a rock, saying: "I will bust every brain out of your head; you God damned bitch of a white-headed Cantrill." He drew the rock and was about to strike her, and that he (appellant) jerked his pistol and fired twice in rapid succession. "When he first grabbed the rock I called him and said, 'Don't do that, dad, let's not have any trouble,' but he paid no attention to me. I shot him because I thought he was going to kill my wife."

The reputation of Easter and Cynthia Picklesimer for morality was shown to be bad and they were contradicted as to material statements. Also the reputation of deceased, Jesse Picklesimer, was, without contradiction, shown to be bad for peace and quietude, and his reputation was shown to be that of a dangerous, desperate and violent man. Appellant offered to show his reputation for peace and quietude and also his good moral character. but was not permitted to do so, and this is the only ground relied on for reversal. There is now no dissent to the rule that in homicide cases the defendant may introduce evidence as to his good reputation for peace and quietude, and in view of the circumstances of this case the exclusion of this evidence was extremely prejudicial to appellant, for which the case must be reversed. As to whether he was also entitled to proof of general good character is a debatable question, and as this evidence was offered on the former trial and likely will be offered again it becomes necessary to pass upon it. The numerical weight of authority seems to be that in criminal cases it should be restricted to the trait involved or bear some analogy thereto, thus "substantive evidence of good character offered by the defendant should be restricted to the trait of character which is in issue or ought to bear some analogy and reference to the nature of the charge, it being absolutely irrelevant and absurd on a charge of stealing to inquire into the prisoner's loyalty or on a charge of treason to inquire into his character for honesty in his private dealings." Greenleaf on Evidence, vol. 3, section 25; 13 R. C. L. section 218; Wharton's Criminal Law, page 536; Wigmore on Evidence, section 59; Young v. Commonwealth, 6 Bush 214; McCandless v. Commonwealth, 170 Ky. 315.

On the other hand, Mr. Bishop in his New Criminal Procedure, sections 1112 and 1113, after quoting the

above citation from Greenleaf, criticises it thus; "But this reasoning ignores the point of the argument in issue. No one contends for the absurdity it states; the proposition on the other side is that general good character may always be shown in defense, not that the particular irrelevant trait may be. Plainly the trait may not be wholly disregarded, yet it is believed that the better doctrine gives to this evidence a wider range. Goodness and wickedness do not flow altogether in channels and a man of good character in general is less likely to commit a particular wrong than one of bad character in general."

The latter view was adopted by this court in the case of Allen v. Commonwealth, 134 Ky. 117, and Denton v. Commonwealth, 188 Ky. 38, and in view of this conflict in our decisions it is deemed proper to finally establish the rule to be followed in this court. While as stated the numerical weight of authority strongly preponderates in favor of restricting the rule to the trait in issue, an analysis of the cases will show that in most instances where this language is used, evidence of *general good character* was not offered but an attempt was made to prove specific traits of character not in issue to which the quoted language applies with full force. Such was the case in Young v. Commonwealth, *supra,* in which in a homicide case evidence was offered tending to show the accused was guilty of the crime of larceny. But, however that may be, we feel that the fairer and juster rule is to permit evidence of general good character in criminal cases. Any felony charge is a stigma and puts the general moral character in issue. An unblemished character is inconsistent with the commission of crime, and when indicted for a felony no good reason can be perceived why the person enjoying such character should not be entitled to prove it as well as that of the particular trait involved.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.

Whole court sitting.