## Vanhorn v. Commonwealth.

(Decided June 19, 1931.)

WAUGH & HOWERTON and MAY & ALLEN for appellant.

J. W. CAMMACK, Attorney General, for appellee.

OPINION OF THE COURT BY HOBSON—Reversing.

Glen O. Vanhorn was indicted in the Floyd circuit court for the murder of his wife, Ina Vanhorn. On the trial of the case he was found guilty and his punishment fixed at life imprisonment. He appeals.

It is earnestly insisted for the appellant that the evidence of the commonwealth was insufficient to warrant a conviction, and that the verdict of the jury is unwarranted by the evidence. This requires a statement of facts shown by the proof. The parties were married December 2, 1929. He was forty-two years old and she was some years younger. He was a locomotive engineer in the employ of the Chesapeake & Ohio Railway Company and located at Martin, Ky. After they were married they rented a room from Mrs. Edan Key and did not keep house, but boarded. While living there in Mrs. Key's house, as shown by her, there was considerable friction and trouble between them, the wife complaining of her husband's attention to other women. In May, 1930, they went together to the office of Mr. Ballard James, an attorney at Prestonsburg. The court declined to make Mr. James testify as to what passed, but soon after this they went to Mr. J. W. Caudill, another attorney at Prestonsburg, and, while Mr. Caudill did not testify, Oscar Bond, who was in the office, testified to these facts:

She said "He was trying to run her off and she still wanted to live with him, and he was trying to

get out of sustaining her, she went out and said she would see him and try to get some settlement with him, if he wouldn't settle she would be back and file suit for alimony. She came back the same day and Mr. Vanhorn came in with her. They had a talk with Mr. Caudill and he appeared to be very angry and said, 'I want you to tell her the whole law of the case' and Mr. Caudill said, 'I have already told her that', he said, 'If she stays away from me twelve months I can get a divorce.' Mr. Caudill said, 'No you can't unless she voluntarily leaves', and he said, 'My lawyer told me I could' and Caudill asked him who his lawyer was and he said it was Ballard James. Mr. Caudill called Mr. James to verify that statement and he said he didn't tell him that and Mr. Vanhorn become more angry, and he said they might pay him to keep her, but they couldn't make him live with her. He accused her of quarreling and she accused him of running around with some woman and that she had only quarreled at him one time and said she wouldn't quarrel any more if he would take her back and live with her and he refused; and Mr. Vanhorn become more angry and as he turned to walk out of the office he said, 'By God I don't have to live with her and if I can't get rid of her one way I can another.' "

Rebecca Ellis makes this statement as to what occurred at Caudill's office:

"He brought her in there and told Mr. Caudill, 'I have brought her down here and I want you to explain some things to her, she doesn't understand', she was crying and said he wanted her to rent a room, he would be willing to do that, and that he had set her things out on the steps and she didn't want to get out and get a room and Mr. Caudill told them to go back and make things all right and come back again and as they started out he said, 'I have offered to do everything that is fair and if I can't get rid of her one way I will another.' "

On the evening of August 3, Vanhorn and his wife got in their car and went from Martin to Allen. After they got to Allen he got out; she declined to get out. He got a glass of Coca-Cola and asked her to have one, which she declined. While they were there he met Trent Sal-

mons and three young ladies. He invited them to get in the car with him and his wife and go down to Martin with them and hear the radio. They accepted the invitations, Salmons riding on the back seat with two of the ladies and one of the ladies sitting in front with Mr. and Mrs. Vanhorn. When they reached Martin they went up to the rooms, then occupied by the Vanhorns, and remained there an hour or more listening to the radio and some of the parties dancing to the music. While they were there Vanhorn got some bottles of near beer and treated the party. One of the ladies then suggested that they had better go home. So they all got in the car about 10:30 and went up to Allen. Mrs. Vanhorn asked her husband to let her drive. He said no, that the car was loaded, that she could drive as they came back. When they got to Allen, their friends got out of the car and they turned around and started back. A mile or two from Allen the road ran along by the side of a high cliff. From the road down to the bottom of the cliff was something over a hundred feet. The road had been cut out of the cliff, but no metal had been placed upon it, and it was not very wide. The next thing that was known about them was when the car was found at the bottom of this cliff; Mrs. Vanhorn was under it and in an insensible condition from which she never recovered; and Vanhorn was standing near the top of the cliff signaling to a car that came by and asking for help. Three witnesses, who lived about a quarter of a mile from where the car went over, testified for the commonwealth; one of them testified, in substance, as follows:

"I heard it start, I got up and went through the house and looked out the lower window, come back out the front door, across the yard on some ties before it went the last time.

"Q. You mean when the car went over it stopped? A. Yes, sir.

"Q. . . . The car made a noise and stopped, I got out of the bed, looked out the window and come back and went out the door across the yard on some ties before it made the last noise.

"Q. Before the car went over the bank or when you heard the noise, did you hear anything on the highway about the mouth of that branch? A. I heard some shooting and hollering.

"Q. You didn't look to see what you could see? A. It was night, I got up and went out in the yard,

I didn't hear anything, I don't know what occurred.

"Q. Did you see anything? A. I saw a car come up to the place, saw it turn and go back down the road toward Allen."

Another witness for the commonwealth testified to this:

"Q. Did you hear anything on the highway before the car went over? A. I heard some shooting, I took it to be a pistol.

"Q. Where was that shooting? A. Below where the car went over on the highway.

"Q. Did you hear anything else? A. Yes, sir, heard some one holler.

"Q. How? A. Just yelled out.

"Q. Man or woman? A. I wouldn't say, couldn't be positive.

"Q. What is your best judgment? A. It seemed like a fine voice."

The third witness gave similar testimony.

On the other hand the defendant testified that, while they were living in the room at the house of Mrs. Keys, she reported to his wife things making his wife unhappy and there was some trouble between them which went on until they went to the lawyer's office in May, but after this they moved away from Mrs. Keys' house and rented the rooms over the store of Greer's and furnished them; that after they went to housekeeping there was never any trouble between him and his wife. They got along very pleasantly. On August 3, the agent from whom he had bought his car for $1,850, came to see him to trade him a new car, offering $1,000 for the old car in the trade. They took a ride with the agent in the new car and according to the agent and the man who was with him everything was friendly and all right. He proved the same facts in substance by the four people who came down that night to his house and he testified that after they got out his wife took the wheel to drive the car home. When they reached the point of the accident they were driving slowly; a car came up rapidly behind them; his wife drove to the edge of the road to let the car pass; it passed very rapidly and made a great dust. The car creened out, and, seeing that it was going over the cliff, he jumped and hollered to his wife to jump. He struck the ground about 20 feet below the road. The car went

about 25 feet and then turned over and went straight down the cliff to the bottom. He got up and went back up to the top of the cliff to signal a coming car and when this car came he stopped it and the man went down to where his car was. He did not then go down as he was waiting to get some others to help. Finally other help came. They then turned the car over. Mrs. Vanhorn was lying under the car. She had a number of bruises on her body. Her skull was fractured above the left ear; her lungs and chest were badly bruised and blood came out of her mouth so much that when she reached the hospital they had to keep her mouth open to keep her from strangling. She died in a few hours. Vanhorn complained of a pain in his side. His shirt and trousers were badly torn, and there were some bruises on his person, but none very serious. There were no pistol wounds on the wife and he had no pistol. The whole trouble, as he showed, was just an accident. He and his wife were going along quietly until the car came up. There had been no trouble between them. He sustained his testimony not only by the testimony of the four visitors that evening, but by a number of other people living in Martin who knew them from the time they moved over the store. The commonwealth proved by the persons who were in the car with them at Allen that the train whistled and when it did so she said that she would be leaving on that train in the morning. The commonwealth tried to get these witnesses to say that she said she would leave her husband in the morning, but they did not so testify, and the commonwealth introduced several witnesses to prove that the witnesses had made this statement soon after the accident. The court allowed the witnesses to answer, but excluded the testimony. The commonwealth also introduced another witness and offered to prove by her that a day or two before the accident the Vanhorns and she and her husband were riding together, that some dispute arose, and Vanhorn said to her husband, "Let's dump these women right here." The witness denied saying this to certain persons, and the commonwealth was allowed to introduce these witnesses and prove that the lady had so told them. The court allowed the witnesses to answer, but excluded the testimony.

When they were married the defendant had his life insured for the benefit of his mother. This policy he afterward had transferred to his wife. By it his life was

insured against a railroad accident in the sum of $7,500 and against an automobile accident in the sum of $2,500. After they were married he also took out a policy on his wife for his benefit in the sum of $2,500 for a railroad accident or $1,000 for an automobile accident. He also had some other insurance, including insurance on the car. Mrs. Vanhorn, as well as her husband, had a pass on the railroad, and he testified that she planned to leave the next morning on the train to get a new pair of shoes. In Moore v. Com., 223 Ky. 130, 3 S. W. (2d) 190, 191, the rule is thus stated:

"It is the rule in this state that a conviction for crime may be had upon circumstantial evidence alone, but the evidence must be of such character that it may not be reconciled with the presumption of innocence that attends every accused person, and must possess such force as to exclude every reasonable hypothesis of the defendant's innocence". To the same effect, see Denton v. Com., 188 Ky. 30, 221 S. W. 202; Conley v. Com., 217 Ky. 155, 289 S. W. 208; Johnson v. Com., 217 Ky. 705, 290 S. W. 693; Burns v. Com., 238 Ky. 446, 38 S. W. (2d) 229.

The defendant testified that he did not use the words at Mr. Caudill's office, as shown by the two witnesses for the commonwealth, but admitted he was there and said what he did with the view to induce his wife to stop nagging him. The testimony of a number of witnesses sustains his testimony and is uncontradicted that after this he and his wife bought the furniture and furnished their home and got along all right until the time in question. Their conduct on that day is shown by a number of witnesses, who saw them during the day, and there was apparently nothing wrong between them. The defendant proved a good character, and there was no contrary evidence on the trial. He was a sober, quiet man. So far as appears he had never used any violence toward his wife. Taking all the facts into consideration, the court cannot escape the conclusion that it is as reasonable that the accident occurred by the car running off the road as shown by the defendant as it is that he ran the car off of the road with his wife in it, for the purpose of killing his wife. All the bruises and hurts on his wife's body may reasonably have occurred as the car tumbled over three times before it finally lodged at the bottom of the cliff. The first car that came went to Allen for help.

The commonwealth proved that the car burned up about 2:30 that morning, about two hours after everybody left there. But the headlights were burning when they left, and, as shown by the evidence, wires may get crossed in a damaged car and the electricity may set fire to it. The defendant was taken from the accident to the hospital and was in bed there, and there is no proof in any way connecting him with the burning of the car. There was some blood on one of the car doors and also some blood on the cushion of the car and some acid had gotten on the cushion, but the acid might have come from the car and there was nothing to connect the defendant in any way with this. The woman would naturally scream when the car went over the cliff, and it may be that what the witnesses took to be the reports of a pistol may have been the noise the car made as it tumbled along the cliff.

Section 606 of the Civil Code of Practice provides:

"No attorney shall testify concerning a communication made to him, in his professional character, by his client, or his advice thereon, without the client's consent."

It is earnestly insisted that the testimony of the two witnesses as to what took place in Mr. Caudill's office should have been excluded. But neither of these witnesses was an attorney of Vanhorn. They were simply bystanders who heard what took place there in the office. The statute only applies to the attorney. The same statute provides that communications between husband and wife shall not be testified to by either of them. But the rule is well settled that bystanders who are present during a conversation between husband and wife may testify to what occurred. There is no reason why the same rule should not apply to bystanders who hear a conversation between an attorney and a client. 40 Cyc. p. 2362, 1 Wharton on Evidence, sec. 588.

When a party introduces a witness who fails to testify to something that the party expected to prove by him, he may not contradict his own witness by proving that the witness said out of court what he refused to say in court, and he may not thus get before the jury what the witness said out of court. In this case there was so much of this evidence introduced that, although the court told the jury to disregard the answers, it may have made an impression on the minds of the jury to the prejudice

of the defendant. The court properly admitted the evidence of the two witnesses as to what occurred in Mr. Caudill's office. But the objections to the questions asked the witnesses as to what the commonwealth witnesses had said out of court should all have been sustained and the question should not have been allowed to be answered by the witnesses.

The evidence here is wholly circumstantial, and all that the commonwealth proved may be true, and yet it may be true that the car simply ran off the road accidentally. The proof is not sufficiently certain to sustain a conviction for murder, and a new trial should be granted. Only those who are proved guilty of felony may be convicted thereof. In view of all the facts occurring at the trial, the court concludes that a new trial should be granted.

Judgment reversed, and cause remanded for a new trial and further proceedings consistent herewith.