## Daniels v. Commonwealth.

(Decided April 21, 1922.)

## Appeal from McCracken Circuit Court.

1. Criminal Law—Circumstantial Evidence.—A conviction, even in a murder case, may be had upon circumstantial evidence alone when it is of such force as to reasonably exclude every hypothesis of the defendant's innocence.

2. Criminal Law—Evidence—Directing Verdict.—Evidence for the Commonwealth in this case held to be of such character, and that therefore the court did not err in refusing to direct a verdict for defendant, accused of murdering his father by administering wood alcohol.

3. Criminal Law—Circumstantial Evidence.—Where every reasonable inference from the whole evidence is consistent with defendant's guilt and inconsistent with his innocence, the evidence, although circumstantial, supports a verdict of guilt.

4. Criminal Law—New Trial—Newly Discovered Evidence.—Newly discovered evidence that is merely corroborative of evidence heard on the trial, and therefore cumulative and which is not of such controlling character as would probably change the verdict, does not warrant a new trial.

5. Criminal Law—New Trial—Newly Discovered Evidence.—Where the defendant met and talked with an alleged newly discovered witness near the time and place of the crime with which he is charged, the evidence of such witness tending to prove that another committed the crime, will not warrant a new trial where no reason or explanation is offered for not ascertaining before the trial what the witness knew about the facts involved, since any kind of diligence would have prompted the defendant to interview such witness for the purpose of learning what, if anything, he knew about the case.

FRANK N. BURNS, MOCQUOT, BERRY & REED and CROSSLAND & CROSSLAND for appellant.

CHAS. I. DAWSON, Attorney General, THOMAS B. McGREGOR, Assistant Attorney General, and JACK FISHER for appellee.

Opinion of the Court by Judge Clarke—Affirming.

Shortly after daylight on Sunday, March 27th, 1921, the body of Joe A. Daniels was found floating in Clarks river. His son, the appellant, Van Daniels, was charged by indictment with having murdered him, either by drowning or administering wood alcohol, but by which method was not known, and upon trial he was convicted and his punishment fixed at imprisonment in the penitentiary for life.

To reverse that judgment he complains that the trial court erred in refusing his motion for a directed verdict, and in refusing to grant him a new trial upon the ground of newly discovered evidence.

The evidence of the Commonwealth conclusively establishes the fact that the deceased did not meet his death from drowning, and that charge was not submitted to the jury. Hence if the Commonwealth must prove the commission of the crime in the manner charged, as defendant contends and we shall assume, the verdict should have been directed for the defendant, unless there was evidence to show that the death of deceased resulted from wood alcohol administered by the defendant for the purpose of producing his death.

Of this there is no direct proof, but these are the facts proven by the Commonwealth:

Decedent was more than seventy years of age and so crippled from rheumatism that he walked with difficulty by the use of a cane. He was a widower, defendant was his only child, and he owned about $2,500.00, mostly in cash, in addition to $9,270.00 in notes against defendant, which he had assigned for purposes of suit merely to one Nelson.

Defendant had been sued on March 7th by the Metropolitan Life Insurance Company for $5,490.00; and on March 18th Nelson had intervened in that suit, seeking a judgment against the defendant for the $9,270.00 due on the four notes that had been assigned to him by the decedent. We gather from the evidence, although this is not clear, that these sums were a lien upon a farm which decedent had conveyed to the defendant. The appearance term of the court in which this action was pending began March 28, 1921.

Decedent made his home with his sister, Mrs. Victoria Straub, in McCracken county, some miles from Paducah, and the defendant lived in Marshall county.

On Saturday, March 26th, defendant was in Paducah, and about nine o'clock that morning decedent also came to Paducah. Defendant was at the time getting ready to go after his father in an automobile, and had asked Roy Ryan to accompany him. When he saw his father in town he said to Ryan that he wished he had his money.

He and his father were together several times during the day, and shortly after dark they drove, in defendant's automobile, from Paducah to the home of Less Dees, who lived three and one-half miles from Paducah on the Benton road. When they arrived at his house, defendant called Mr. Dees out and the latter took a seat in the automobile by the side of the father, while the defendant went to a store across the road.

Mr. Dees and decedent were old friends, and after they had been conversing a short time, defendant returned to the automobile; decedent said that he had to have some money, but defendant said, "You don't have to have it, you just want it." Dees then asked defendant if he wanted to sell his farm, and he said he did not, but that he would sell it if he could get $18,000.00 for it, but Dees said he did not want it at that price. A little later Dees asked defendant, "Did you come to borrow some money?" and he replied that he had not, that he had made arrangements with one Palmer for a long-time loan.

Without having disclosed the purpose of their visit defendant and his father left Dees at about nine o'clock, going towards Paducah. About half way between Dees' home and Paducah the road crosses Clarks river on a bridge, above where decedent's body was found the next morning; and about half or three-quarters of a mile beyond the bridge, towards Paducah, the defendant's automobile was seen standing on the side of the road by some four or five witnesses, at different times between ten and twelve o'clock that night. By some of these witnesses defendant was seen and recognized, at or near the automobile.

At twelve o'clock defendant appeared at the home of Edward Hancock and asked to be allowed to use his telephone to get a man by the name of Burton to come and help him fix his car, which he said he would leave for the night except that his father was in the car and was crippled and could not walk. After learning that Hancock's telephone was not an "old" 'phone, he asked who had the old 'phone in the neighborhood, and, being directed to Mr. Roark's, he started in the direction of his home,

and about twenty minutes later Mr. Hancock saw him returning from the direction of Roark's home in the company of two other men.

Defendant appeared with his car at a garage in Paducah about six a. m., and while he was there working on his car, he was told that his father's body had been found in the river. About 8:30 a. m., with one Skillion, he drove to Hancock's store and to the place where an inquest was being held, and Skillion testifies that as they were leaving town defendant threw six coco cola bottles out of his automobile, saying, "I had better throw them out, they will suspicion something."

When examined at the inquest, nothing was found in decedent's pockets except some scraps of paper. Defendant identified his father's body and cried. Shortly thereafter he was arrested and there were found on his person two watches, two pocket knives, some keys and $54.00 in money. One watch, one knife and the keys were identified as the property of the father and by the Commonwealth's witnesses it was shown that deceased had the watch, knife and keys in his possession on Saturday, and that when he left his sister's home that morning he had $52.00 in money. Just before arresting defendant the officer had this conversation with him:

"I asked him where he left him (his father) and he said he left him on the side of the road in the car while he went to the telephone to get somebody to come and fix it. I said, 'How long were you gone?' and he said, 'about an hour,' and I said, 'Where was the old man when you went back?' and he said, 'He was not there,' and I said, 'Where did you think he was?' and he said, 'I did not know, I thought he came on to town.' I said, 'Did you see anybody coming to town?' and he said. 'No.' I said, 'Did you look for him?' and he said, 'He could not walk very far,' and I said, 'Wasn't you uneasy about him?' and he said, 'No,' and I said, 'What time did you put the car up?' and he said, 'About six o'clock,' and I said, 'Did you go to bed?' and he said, 'No.'

"Q. Did he say where he was after 12 o'clock?

"No, sir, he never did say."

An autopsy was held by Doctors Willingham, Bass and Blythe some time Sunday, but not until after the body of the deceased had been embalmed. These doctors testified that from their examination they were convinced that the deceased did not die from drowning, and two of them stated that in their opinion his death was caused

by asphyxiation, and that this could have been caused by wood alcohol, if taken by or administered to the deceased in sufficient quantity, and that they could discover no other cause for his death. Dr. Bass testified that "I think this man died of asphyxiation, and in the final analysis I really think it was from wood alcohol;" and that formaldehyde is not supposed to contain any wood alcohol, "but upon a test for it they can trace it up to 1/200000th. In the oxidation of the wool alcohol in making formaldehyde you don't have all the wood alcohol oxidized and that way they can trace it, but there would be very little trace of wood alcohol in that formaldehyde."

They removed the stomach, which contained four or five ounces of liquid, securely tied both ends, placed it in a quart jar and filled the jar with the embalming fluid the undertaker had used to embalm the body. The jar was sealed and sent to Dr. Gradwahl, a chemist in St. Louis, who made a chemical analysis of the contents of the jar, *en masse*.

Dr. Gradwahl testified that as a result of his examination and analysis he obtained a very distinct reaction of wood alcohol, and that such a reaction would not have resulted from a mere trace of wood alcohol.

This is the substance of the evidence for the Commonwealth, and while wholly circumstantial, it points quite convincingly to the defendant as the author of his father's death, and furnishes some evidence at least that the cause of the death was wood alcohol administered in sufficient quantity to produce asphyxiation.

The rule is thoroughly established in this jurisdiction that a conviction, even in murder cases, may be had upon circumstantial evidence alone, when it is of such force as to reasonably exclude every hypothesis of the defendant's innocence; and that such evidence is often more conclusive and satisfactory in establishing the guilt of the accused than is positive and direct testimony. Smith v. Commonwealth, 140 Ky. 599; King v. Commonwealth, 143 Ky. 127; Wendling v. Commonwealth, 143 Ky. 587; Peters v. Commonwealth, 154 Ky. 689; Mobley v. Commonwealth, 190 Ky. 421; Bowling v. Commonwealth, 193 Ky. 647.

We are of the opinion that the evidence for the Commonwealth is of such character, and that the court did not err in refusing to direct the verdict for the defendant at

the close of the Commonwealth's evidence. This being true, the same motion was properly overruled when renewed at the close of all the evidence, since it was the province of the jury to determine whether or not the evidence introduced by the defendant was sufficient to overcome the inferences of defendant's guilt as charged that were reasonably deducible from the plaintiff's evidence.

The defendant did not testify, but he introduced evidence to explain his possession of his father's watch, knife and keys, and of the $54.00 he had when arrested. He proved by two or three witnesses that his father gave him the watch a week before his death, which is but contradictory of the evidence for the Commonwealth that his father had his watch thereafter, and as late as 4 p. m. upon the Saturday before his death.

He proved by the man at the garage in Paducah, where defendant had his car on Sunday morning following his father's death, that this man found the knife and keys under the front seat in the automobile and that morning gave them to the defendant; and he proved by several witnesses that he had on Saturday about $60.00.

Clearly this evidence but made an issue with the evidence of the Commonwealth upon a single feature of the case, from which the jury possibly might have drawn either of two inferences with reference to the decedent's property and the money found upon defendant, one favorable to the defense, the other confirmatory of the theory of the prosecution; and upon all of the evidence so far related, it certainly was a question for the jury to decide whether or not the defendant was guilty of having murdered his father, as charged in the indictment.

In fact the only element of doubt in our minds, after a careful consideration of the whole evidence, is as to the manner in which death was produced, and, as we have already pointed out, there was some evidence, at least, that it was caused by wood alcohol, since such is the only reasonable inference from the proof of Drs. Gradwahl and Bass, which is not contradicted at all unless by the evidence of defendant's witness, Mr. Ochs, who is the chemist for the company that manufactured the embalming fluid known as Veino Esco Raco, with which decedent's body was embalmed, and in which his stomach was immersed. The pertinent portion of his testimony is as follows:

"Q. State whether or not you know if the chemical analysis of the stomach of the human body which has

been immersed in the embalming fluid known as Veino Esco Raco would show methyl or wood alcohol in the tissues or contents of such stomach.

"A. I believe the chemical analysis would show wood alcohol in the tissues and contents of the stomach.

"Q. Do you know whether or not the stomach of the human body that had been embalmed with this embalming fluid would show methyl or wood alcohol after such embalming of the body?

"A. I believe it would."

Not only does this evidence fail to destroy the evidence that wood alcohol was the cause of the death, as counsel for appellant assume, it does not even contradict it. The evidence of Dr. Gradwahl proves that his analysis of the stomach, its contents and the embalming fluid in which it was immersed produced a very decided reaction of wood alcohol, and that such reaction would not have been obtained from a mere trace thereof.

Mr. Ochs does not say that more than a trace of wood alcohol would have been obtained from an analysis of the embalming fluid or of a stomach treated with it. The evidence shows, without contradiction, that the preserving element in the embalming fluid was formaldehyde made from wood alcohol, and Dr. Bass testifies that from a chemical test of such formaldehyde, merely a trace of wood alcohol would have been obtained.

Hence we are of the opinion that every reasonable inference from the evidence is consistent with defendant's guilt as charged in the indictment, and entirely inconsistent with his innocence, and that, therefore, the evidence, although circumstantial, supports the verdict.

The newly discovered evidence, because of which it is insisted the court erred in refusing a new trial, consists of the testimony of three witnesses that they saw the knife and keys of the deceased placed upon the front seat of the defendant's automobile about four o'clock on Saturday afternoon, and of the evidence of another witness that at about twelve o'clock on Saturday night he saw the deceased get out of defendant's stalled automobile into another, in which there were three unknown persons, and that they started toward Paducah.

It was shown upon the trial, without contradiction, that the pocket knife and keys of deceased were found under the seat of defendant's automobile on Sunday morning by a man at the garage in Paducah, and by him delivered to the defendant. The evidence of these three

new witnesses is, therefore, but corroborative of uncontradicted evidence heard upon the trial, and cumulative; and not being in our judgment of such controlling character that it would probably change the verdict, it did not authorize a new trial. Ellis v. Commonwealth, 146 Ky. 715, 143 S. W. 425.

The affidavit of the alleged newly discovered witness Bass, who states that he saw deceased get out of defendant's automobile into another about midnight, discloses the fact that just a few minutes previous thereto he met and talked with the defendant within a short distance of the stalled automobile, and any kind of diligence upon the part of the defendant would have prompted him to have ascertained before the trial what, if anything, this witness knew about the facts under investigation. No reason or explanation is offered why this was not done, and evidence that was not but could and ought to have been discovered before the trial, does not authorize a new trial. Fuson v. Commonwealth, 162 Ky. 341, 172 S. W. 646.

Convinced that the record contains no error prejudicial to the appellant's substantial rights, the judgment must be and is affirmed.