## Marcum v. Commonwealth.

(Decided December 18, 1925.)

### Appeal from Martin Circuit Court.

1. Homicide—Evidence Held as Consistent with Accused's Innocence as with His Guilt, and Trial Court should have Given Peremptory Instruction.—Evidence in murder prosecution held as consistent with accused's innocence as with his guilt, and trial court should have given peremptory instruction to find him not guilty.

2. Criminal Law—If Evidence is as Consistent with Innocence as with Guilt, Conviction Cannot be Sustained.—Conviction may be had on circumstantial evidence alone, but, if evidence be as consistent with accused's innocence as with his guilt, it will not support conviction.

WILLIAM R. McCOY and JAMES DAMRON for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE—Reversing.

Appellant, Riley Marcum, and his wife, Mary Marcum, were jointly indicted in the Martin circuit court for the crime of murder. The indictment charged that they, together with others unknown to the grand jury, con-

spired to do so, and that they, in furtherance of the conspiracy, did slay and kill U. G. Johnson. Appellant was tried separately, was found guilty of manslaughter, and his punishment was fixed at confinement in the penitentiary for sixteen years. He appeals.

The most serious question presented by the appeal is whether the evidence heard upon the trial hereof is sufficient to establish that a crime was committed when U. G. Johnson met his death. The consideration of that question makes it necessary to discuss at length the evidence produced upon the trial of this cause. The man who died, U. G. Johnson, was 55 years of age; was six feet and two or three inches high, and weighed approximately 240 pounds. He was at the time and for twelve or fifteen years had been county superintendent of schools of Martin county, Kentucky. He left his home at the county seat two days before he was found dead, for the purpose of visiting some of the schools of his county. The evidence establishes that from noon until approximately five o'clock in the afternoon of October 5, 1923, he was in and about Naugatuck, West Virginia, just across the state line. About five o'clock in the afternoon he crossed Tug river and returned to the Kentucky side. Some eight or ten witnesses who saw him and talked with him immediately before he crossed back into Kentucky, and while he was doing so, and immediately afterwards, testified herein, by whom his whereabouts at that time was established beyond question. Asberry Evans, who lives on Tug river about a quarter of a mile above the mouth of Long branch, testified that he came to his home about five o'clock in the afternoon of October 5th. It appears from the testimony that Johnson remained at Evans' home five or ten minutes and left. He traveled the road down Tug river to the mouth of Long branch, walking. Asberry Evans, who saddled a horse and followed, overtook him at the mouth of Long branch. The two of them traveled the road leading up Long branch for about 150 yards and there met Heenan Marcum, Mose Simpkins, Bud Murphy and Marion Brewer. Johnson stopped and talked with them, and Evans left and went to the home of John Etters. Shortly thereafter he rejoined Johnson at a place on Long branch known as the "log yard," whither Johnson had proceeded after leaving Marcum, Simpkins, Murphy and Brewer. He and Johnson talked some few minutes at the log yard and separated, Johnson following the road that led up Long branch in the direction

of appellant's home, and Evans returned to his home
by the road that led down Long branch. In the con-
versation had at the log yard Johnson told Evans that
he was going to the home of defendant, Riley Marcum.
By all of the witnesses who saw and talked with John-
son while in West Virginia and when he crossed back
into Kentucky, and from the home of Asberry Evans
to the point on Long branch where Evans left him, it
was proved that he was walking; was in his shirt sleeves;
was carrying his coat on his arm; that he did not ap-
pear to be drinking, and that none of them saw him
with any whiskey. The witness, Asberry Evans, ad-
mitted on cross-examination, however, that when he left
Johnson on Long branch and went to the home of John
Etters he purchased a dollar's worth of whiskey that
was delivered to him in a quart jar and took it with
him to the place where Johnson was waiting on Long
branch. He stated, however, that he hid the whiskey
there at the log yard in the presence of Johnson and
that he did not get it for Johnson. He admitted that at
the time he purchased the whiskey he told Henderson
Burgett, who was present, that he was getting it for U.
G. Johnson. Evans appears to have been the last person
to see U. G. Johnson before he reached the home of de-
fendant, Riley Marcum, and no one appears to have seen
him between then and when he died except the defend-
ants, Riley Marcum and his wife, and their two small
children. The Commonwealth was unable to produce any
evidence that there had ever been any ill-feeling or mis-
understanding of any character between deceased and ap-
pellant Marcum. On the other hand, the evidence all
tends to establish that the relations between them had
been extremely friendly and cordial. Deceased appears
to have been of that character or disposition conducive
to friendly relations with everyone. He was affection-
ately called "Uncle G." by all of the witnesses who testi-
fied herein. The friendly relation between him and the
defendant, Riley Marcum, is indicated strongly by the
fact appearing in the record that "Uncle G." had nick-
named the defendant "Brownie," and always called him
that because of a song by that name that appellant was
accustomed to sing for him.

Appellant is 26 years of age and weighs 125 pounds.
He appears to be a poor man. He was living at the time
in a two-room log cabin. One room was used as a bed-
room, the other as a kitchen and dining room. The bed-

room contained two beds, and the chief articles of furniture in the kitchen consisted of a cook stove and a table. The partition between the rooms, like the walls of the cabin, was constructed of hewn logs. The interior of the building was neither ceiled nor plastered, but the cracks between the logs were chinked with clay. A large, rough stone chimney stood in the partition wall between the bedroom and the kitchen, with a fireplace for burning wood in either room. The face of the chimney was flush with the bedroom wall and it extended beyond the wall out into the kitchen. The fireplaces were three or four feet in width and height, and there appears to have been on the hearth in the kitchen a large, rough stone that was used instead of dog-irons to support the logs of wood.

About six o'clock on the morning of October 6, 1923, appellent, Riley Marcum, went to the homes of some of his neighbors and notified them that U. G. Johnson was dead at his home. A messenger was dispatched on horseback to carry the news to Johnson's family. The alarm spread rapidly, and a crowd soon gathered at defendant's home. They found the body of Johnson lying in the kitchen, with his head in the doorway between the two rooms. There was blood on the floor under his head and it had run down one of the planks into the bedroom for approximately three feet. There appeared to be wounds on and about deceased's head which were described by a great many witnesses introduced for the Commonwealth. The most satisfactory evidence as to the nature and extent of these wounds is from the testimony of Edgar Ball, the undertaker, who, under employment by one of deceased's sons, embalmed and prepared for burial the body of U. G. Johnson, and that of Dr. M. Ford, who, under employment by one of deceased's sons, made a postmortem examination of deceased's body and the wounds found thereon for the purpose of ascertaining their extent and nature. According to their testimony, there were in the forehead of deceased three small wounds, which penetrated the skin, but none of which reached the skull. There was a small abrasion on top of the head and there was a wound in the back of the neck about where the skull and spinal column joined about three quarters of an inch long and a quarter of an inch deep. The latter wound is the one from which the blood had escaped that was found on the floor. No witness took the position, however, or expressed the opinion that deceased died from loss of blood. On the other hand, the evi-

dence establishes that the undertaker in embalming the body took from his veins so much blood as to negative any theory that he might have died from loss of blood. Those are the only wounds appearing upon the body of deceased, according to the testimony of the undertaker and of the doctor employed to make the post-mortem examination. The family physician of deceased, who was present when the post-mortem examination was made, and one or two other witnesses, testified that there was a wound over the left ear of deceased in the nature of a bruise or contusion about three inches long. That wound and the one in the back of his neck, as described by that physician, were more serious than they appear to be from the testimony of any other witness. With reference to the former he said:

A. "That was just a blue welt, and we really didn't examine it as well as we should—the fact of the business is, we were looking at the other wounds, and after Dr. Ford had walked out on the porch and we were fixing to put him back in the casket, I believe it was Jim Horne that called my attention to it, and then I looked at it. It was a welt three or four inches long; it was contused and felt like it might be crushed. Q. The skull was crushed? A. It felt that way; I wouldn't say it was serious, but I would say he had a hard lick there."

He described the latter wound:

A. "It was cut like, and went down where the atlas and axis join, and looked like, on the outside, like just a clean cut; I didn't pay any attention to it before I made an examination, because it looked like a flesh wound down to the bone, and I run my fingers in and felt, and the bone felt roughed up; I don't know, I never measured it, or paid so much attention to the size, but it was about an inch long; a straight up and down wound."

Further, with reference to those two wounds, he testified:

Q. "In your judgment, was that wound in the back of the head sufficient to produce death? A. Yes, sir, I would think so, because it don't take much of a blow there to produce death; a fellow frequently kills another with his fist by striking him there—

I don't know at that particular point; it is pretty hard to dislocate, but the first vertebra there is very easy to break; we didn't examine that particularly, but that is the place that generally breaks when they hang a man. Q. Can you tell from your examination whether that was severed? A. No, sir, I could not—it was not severed where the atlas and axis join. Q. What would you say with reference to the wound above the left ear? A. That, if it was as I think it would be, I wouldn't say so unless we had examined it further, but it looked like it had come in contact severely with something there; there was a black welt there and it was all mushy. . . .

Q. "Tell whether or not that blow, as you saw it by your examination, tell the jury if it was sufficient to produce death? A. Well, it might have been and it might not—I would rather not say on that—a many a lick that probably wasn't as severe as that looked to be has produced death, and many a one looked severer than that, has in the same location failed. That is as near as I can get to it to be fair to both parties.".

That witness with reference to deceased's wounds further said:

Q. "Each and every wound made on the deceased could have been made by falling, couldn't it? A. If you put it down to 'could' there are circumstances under which it could; this one back here (indicating wound on back of neck) would be the hardest to account for."

Further, in answer to a question propounded by the court, he said:

"I just know the wounds were there and the man is dead, but as to how he received them and what produced his death I can't say."

Appellant testified that on Friday morning before he had arisen deceased came to his home and remained there a few moments; that they took several drinks of whiskey together; that he accompanied deceased for a distance as he left; and that they arranged before separating that deceased would return to his home to spend the night, and that they would each try to procure a quart of whiskey that day for their use that night. A niece of deceased was at the home of appellant Marcum

Friday morning and corroborated him that deceased came there and that the two of them were then drinking together. Two other young women who met deceased and appellant on the highway as they left appellant's home early Friday morning testified to that fact and to the fact that the two of them were drinking. Appellant testified that, pursuant to the arrangement, he procured a quart of whiskey on Friday and that, although he had drunk the most of it before returning home, he had part of it left and that when he returned he found deceased there. He testified that he did not reach home until about 9:30 o'clock, and when he arrived deceased was sitting in the kitchen. Because of a toothache, his wife had retired. She offered to get up and prepare supper for him. He did not permit her to do so but got it himself, and that he and deceased, sitting before a small fire in the kitchen, drank the remainder of the whiskey he had procured and that that deceased had with him. They sat up until twelve-thirty or one o'clock drinking, talking and singing. Deceased had a quart of whiskey in a quart jar. He testified that both of them became intoxicated and that deceased finally got sick, and, while leaning over his chair vomiting, the chair slipped from under him and deceased fell into the floor. He testified that that occurred two or three times. They finally undertook to retire but deceased was too drunk to walk. He undertook to help him but he was so drunk and so much smaller than "Uncle G." that he was unable to be of any assistance. He suggested that "Uncle G." try to crawl to the bed, but he said: "You go on to bed, 'Brownie,' and I will come when I get to feeling better." He testified that thereupon he retired, went to sleep, slept all night without waking, and that when he awoke about five-thirty the following morning he found deceased lying on the floor dead. He testified that though deceased had fallen several times before he retired, if he had been wounded any by the falls he did not know it. The evidence discloses that there was blood on and about the stone lying on the hearth in the kitchen and at another place or two on the floor.

All of the people who saw appellant Marcum on Friday, the day before deceased was found dead in his home, appear to have been introduced as witnesses herein, and it appears from their testimony that he purchased his whiskey about noon and that he and the person from whom he purchased it spent most of the after-

noon playing cards together, during which time they drank a portion of his quart of whiskey. At dark he was about three miles from home, and on his way home stopped at the residences of several of his neighbors. At the last place he stopped ten or twelve persons appear to have been present. It was shown by some of them that appellant had some whiskey in a fruit jar which he hid near the house; that he stayed there some little time and ate something while there. It was shown by some of them that he was armed then with a .44 caliber pistol, and he appears to have left that place in company with two other persons in an automobile who took him as far on his way home as the route they were traveling coincided. He left the car at the mouth of Twin hollow, which appears to have been the natural place for him to do so in order to go directly home, and was not seen by anyone else until the next morning. The witnesses differ as to the time it was when appellant left the last place he stopped and as to when he left the automobile, but from the testimony as a whole that appears to have been about nine o'clock.

No club or weapon of any kind was found in or about the home of appellant which the Commonwealth claims was used in inflicting the wounds found upon deceased's head. The strongest testimony tending to establish that the death of U. G. Johnson resulted from any of the wounds found upon him was that of Dr. Fairchild, copied, *supra*. The physicians and all others who testified on the question admitted that in their opinion the wounds found upon the head of deceased could have been inflicted by his falling upon the stone lying in the hearth or against the corner or edge of the table or other exposed surfaces about the room where he was found. The evidence discloses that for some two or three years prior to his death deceased at times had suffered attacks of dizziness, and on an occasion or two had fallen while so affected, and that he had been taking strychnia for that condition. The physicians who testified admitted that in that state of case drunkenness to intoxication, while at first stimulating, is followed by a period of heart depression, and that deceased may have died from heart failure to which the wounds upon his head contributed in no wise. They likewise testified that drinking to intoxication frequently produces cerebral hemorrhage, with resulting paralysis and death; and admitted that

deceased's death may have been caused in that way without the wounds upon him contributing in any wise to it.

It thus appears that the evidence introduced herein tending to establish that a crime was committed when U. G. Johnson met his death, and that appellant, Riley Marcum, was the author of that crime, was wholly circumstantial. In Daniels v. Commonwealth, 194 Ky. 513, 240 S. W. 67, it was written:

"The rule is thoroughly established in this jurisdiction that a conviction, even in murder cases, may be had upon circumstantial evidence alone, when it is of such force as to reasonably exclude every hypothesis of the defendant's innocence; and that such evidence is often more conclusive and satisfactory in establishing the guilt of the accused than is positive and direct testimony. Smith v. Commonwealth, 140 Ky. 599, 131 S. W. 499; King v. Commonwealth, 143 Ky. 127, 136 S. W. 147; Wendling v. Commonwealth, 143 Ky. 587, 137 S. W. 205; Peters v. Commonwealth, 154 Ky. 689, 159 S. W. 531; Mobley v. Commonwealth, 190 Ky. 424, 227 S. W. 584; Bowling v. Commonwealth, 193 Ky. 647, 237 S. W. 381."

When the circumstances proved upon the trial of a case to establish the commission of a crime are as consistent with defendant's innocence as with his guilt they are held to be insufficient to reasonably exclude every hypothesis of defendant's innocence; and that has led to the following qualification of the rule which is as well established as the rule itself:

"The rule that a conviction in a criminal case may be had upon circumstantial evidence alone is subject to the qualification that, if the evidence be as consistent with defendant's innocence as with his guilt, it is insufficient to support a conviction." Chambers v. Commonwealth, 200 Ky. 295, 254 S. W. 906; Mullins v. Commonwealth, 196 Ky. 687, 245 S. W. 285; Daniels v. Commonwealth, 194 Ky. 513, 240 S. W. 67; Hill v. Commonwealth, 191 Ky. 477, 230 S. W. 910; Denton v. Commonwealth, 188 Ky. 30, 221 S. W. 202; 16 C. J., p. 763, sec. 1568; 8 R. C. L., p. 225, sec. 222.

The wounds upon deceased's head and the fact that he died in the home of appellant, when all of the evidence

is reduced to a final analysis, are the only two circumstances produced in evidence that tend to establish his guilt of the crime charged. Deceased was six feet, two inches in height, and weighed 240 pounds. Appellant weighed only 125 pounds. It seems wholly unreasonable and improbable to conclude that appellant could have inflicted those wounds upon deceased in an attempt to injure or kill him and have come out of the affray with no mark or evidence of it upon himself. It appears that when appellant went home that night he was armed with a .44 caliber pistol. If, as is suggested for the Commonwealth, upon arriving at his home he found deceased and his wife in improper relations with each other—wholly a conjecture, drawn entirely from the realm of speculation—it seems wholly reasonable to conclude that appellant would have used his pistol to execute his purpose thus formed to kill deceased. If for any other reason arising suddenly appellant had attempted to take deceased's life, it seems altogether probable that he would have used his pistol as the agency. All of the wounds, from the evidence herein, may certainly as reasonably be accounted for as being the result of deceased's falling while intoxicated upon the stone on the hearth, or against the rough stones in the chimney, or some other object in appellant's kitchen as that they were inflicted by him.

The wounds, as appears from the great weight of the testimony herein, were superficial, inconsequential and wholly insufficient to have produced death. From a consideration of the entire record, all the facts and circumstances proved herein, it seems that the most reasonable conclusion as to how deceased came to his death is that he died of heart failure following intoxication, and that the wounds upon him contributed in no wise to his death.

When all the facts and circumstances are considered fully, it becomes apparent that the evidence is as reasonably consistent with appellant's innocence as with his guilt. They fall far short of constituting a case of circumstantial evidence of such force as to reasonably exclude every hypothesis of defendant's innocence. Those are the tests to which circumstantial evidence must be subjected when it is offered as the sole support of a verdict of guilty.

It follows that the Commonwealth wholly failed to make a case against appellant, and, at the close of all the

evidence, the trial court should have peremptorily instructed the jury to find him not guilty. For the reasons indicated, the judgment herein is reversed and this cause remanded, with direction that appellant be granted a new trial hereof; and if, upon another trial, the evidence be substantially the same, the trial court will direct the jury to find the appellant not guilty.