## Holmes v. Commonwealth.

(Decided February 15, 1927.)

### Appeal from Lee Circuit Court.

1.  Criminal Law—Where Uncontradicted Petition Complied with Statute and was Supported by Affidavits, Change of Venue Should Have Been Granted.—Where petition for change of venue complied with statute and was supported by two affidavits and no evidence was offered to contrary, change of venue should have been granted.

2.  Homicide—Evidence of Murder of Wife by Causing Automobile to go Over Cliff Held Insufficient for Jury.—Commonwealth's evidence in prosecution of defendant for murdering wife by causing automobile in which she was sitting to go over steep cliff held insufficient to go to ury.

3.  Homicide—Evidence Held Not to Support Conviction for Murder of Defendant's Wife by Directing Automobile in which She Sat Over Cliff.—Evidence held not to support conviction of defendant

for murdering wife by causing automobile in which she was sitting to go over steep cliff.

E. B. ROSE, FRANK S. GINNOCCHI and CARTER D. STAMPER for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

Virgil Anderson Holmes was indicted in the Lee circuit court for the willful murder of his wife Louisa Holmes, by driving, running and directing an automobile, in which she was sitting, over a steep, high cliff, thereby hurling her with great force to the ground below and causing her death. The defendant pleaded not guilty. On the second trial of the case he was found guilty of murder and his punishment fixed at life imprisonment. He appeals.

The testimony for the commonwealth is, in substance, as follows: On November 10, 1925, the defendant, with his wife and two children, in a Ford car drove out of Beattyville on the Irvine pike. As they went along they passed, a mile or two out, R. G. Riley and wife, who were riding out the pike on horseback. Soon after this, and before Riley reached a cliff known as Bear Track, he saw Holmes coming down the road toward him, walking a very curious walk. When he got near them Riley said, "What is the matter with you?" He commenced to try to tell him, made two or three staggers at it. He stretched out his hand and said, "Lord, wasn't that awful?" Riley said, "What is awful; did the car run over you?" He said, "No, I was putting a chain on the car and told her to back the car up and it went over the cliff with her." He fell down in the road. Riley got down to him and shook him and said, "Your wife and children is over that cliff; I will go to them; you go to that next house and call for help." Holmes went on down the road, as directed by Riley, to get further help, and the next man he came to thus states what occurred when he got to his house:

"He opened the gate and walked in. I walked out and met him half way of the yard. He came right up to me; he was pointing. He said, 'I went

out here to the Bear Track, my wife and two little children in the car,' he says, 'I pulled down over that rock there and turned around, got out to put on my chain. I told her to back up a little and she backed too far and slipped right over the cliff with my wife and two children,' said 'Lord have mercy.' He fell down right there and went to crying, fell down and rolled right over and over, rolled and tumbled and cried. He wanted me to go to town after the doctor. I told him, 'Well, I will go.' ''

They all then went back up to the cliff and found that the wife and one of the children were dead; the other child was not seriously hurt. The car was a complete wreck, as the cliff was about ninety feet high and precipitous. The county judge was introduced by the commonwealth. He says that he asked the defendant why he drove into Bear Track and that he answered as follows:

''Well, for the purpose of picking mountain tea, and my wife mentioned about she wanted to get out to herself, and we was talking about gathering mountain tea after we had turned around and she wanted to gather some to take home to her father, I don't think he had ever seen any, and as we talked this we were nearing Bear Track and so I said we will drive down in there. . . . When I got out of the car I stopped the car there and got out and walked around. I discovered that the chain had come loose on the outside and had dropped over on the axle of the car. . . . The chain was off of the tire wheel and lying on the axle and was drawn in such a manner that the casing was setting on the chain being caught, caught on the spring perch and underneath the wheel. . . . I walked around there. I drove down and stopped. I got out and walked around and I discovered that, and I mentioned the fact to her and I said the chain is off, and I asked her then to get me a pair of pliers, and after I had scooted down behind the hind wheel to unhook the catch of the chain she reached back in the back part of the car and took the tool bag and poured them out in the front seat, and I asked for the pair of pliers, but she couldn't find them, said they wasn't in there, and by this time I was working at it with my thumb. I had got the catch shoved up

and I asked her then to give me a little slack that I might unhook it and then withdraw the chain out from under it. . . . Well, I suppose she applied the gas; the engine began roaring and making a noise and racing, the engine, and I called to her, 'Not so much gas, not so much gas,' and it continued to roar a little more if anything, and I raised up and started to go to her, and it continued to roar, and as I started up to the front of the car she came back quickly and swiftly with a jerk and I caught at the car and fell and by the time I got up the car had made this half circle and was pointing, facing the cliff. I ran to her as fast as I could, hollering 'Hold it, hold it,' and the car hesitated a bit on the cliff and left me by the time I got within four feet of the car or something like that running to it, it left me, went over the cliff.''

He made similar statements to a number of other people. His statements were all practically to the same effect, and there was no fact shown indicating that anything he said was untrue. The commonwealth showed by four witnesses that on one occasion in the spring when his wife was driving the car and had narrowly missed running into another car he came up and was rude to her, according to two witnesses, and according to two others was rough with her and pulled her out of the car, saying that she had no business to be driving the car. But this was four or five months before the tragedy and was not shown to be followed up by any bad feeling, except one witness testified that one evening a month or two before the accident he and his wife were scuffling over a switch on the street; finally she said, ''Stop, Ance, I am getting mad,'' and then he let go and she went in the house and he went down the street.

On this evidence the defendant moved the court to instruct the jury peremptorily to find him not guilty. The court overruled the motion. The defendant then introduced his testimony.

He was a soldier in France. While there he lost one hand and was also shell shocked. By reason of this he remained in the hospital until he returned to this country and after he reached here was committed to an insane asylum because the shell shock had affected his mind. He was discharged from the army as totally and permanently disabled. He received a pension of $157.00 a month.

After he got out of the asylum he was operated on for appendicitis at Lexington, Kentucky, and while there he met his wife, who was a nurse in the hospital and they were afterwards married. After they were married he was sent to the insane asylum over in Indiana by the government, and when he was released from there he and his wife went to her father's near Maysville. After staying there some time they came down to Beattyville in their car to live with a sister of his who was living there. They remained there for some months. In November they decided to go back to Maysville for the winter and decided to start back on November 11th. On November 10th he gave his wife $20.00 to get some things for herself and the children. They went up town with his sister in the car to buy some eatables for a farewell supper they wanted to give their friends that evening, and when they returned with their provisions, about four o'clock, his sister got out and said she would get the supper and his wife suggested that they take a little ride and they drove out the Irvine pike. When they reached Bear Track his wife suggested that she would like to get some mountain tea to take to her father, and they drove off the pike on to Bear Track for this purpose. His statement on the trial as to what followed was just what he stated at the time to others, except that he said that when his wife and children went over the cliff he ran down to the pike to get somebody to help him. He also proved by all the people who knew them well that he and his wife were living happily together and that there was no breach of any kind. This evidence stands entirely uncontradicted, except by the five witnesses above referred to as to the two isolated occurrences some months before.

The petition for a change of venue complied with the statute and was supported by two affidavits. No evidence was offered to the contrary and on these facts the change of venue should have been granted. Hunter v. Com., 208 Ky. 466.

It is a fundamental principle of our law that no man can be convicted unless proven guilty by competent evidence. There is no evidence here that the defendant committed any offense. As shown by the testimony the facts were that the car backed over the cliff when the wife was sitting in the car and in charge of it. The cause of the trouble was that instead of giving a little slack she entirely released the brakes and then put her foot on the

wrong pedal and gave the car thus such a momentum that it backed over the cliff. It was simply an unfortunate accident. On the proof for the commonwealth the court should have instructed the jury peremptorily to find the defendant not guilty.

The brief for the attorney general concludes with these words:

"We have read the record carefully and are forced to the conclusion, after reading same, that the verdict of the jury is not in harmony with the evidence in the case."

The court after reading the record has reached the same conclusion. The verdict is not supported by the evidence. The other errors complained of will probably not occur on another trial.

Judgment reversed and cause remanded for further proceedings consistent herewith.