## Jack v. Commonwealth.

(Decided June 21, 1927.)

### Appeal from Pike Circuit Court.

1. Homicide.—Indictment for murder, specifying how murder was committed and charging in effect that certain persons conspired to kill person unknown to grand jury, and that in pursuance of such conspiracy one or more conspirators killed unknown by exploding powder or high explosives, with further allegation that it was unknown in just what manner explosion was caused, held sufficient as against demurrer.

2. Homicide.—In prosecution for murder pursuant to conspiracy, as alleged in indictment, evidence held sufficient to make question of guilt or innocence one for jury.

3. Criminal Law.—In prosecution for murder, where state introduced testimony of accomplice, failure to instruct, under Criminal Code of Practice, section 241, that conviction cannot be had, unless testimony of accomplice is corroborated by other evidence tending to connect defendant with commission of offense, held erroneous.

4. Witnesses.—Questions by attorney for commonwealth, while interrogating witnesses for commonwealth, must not be leading or suggest answers desired.

DAUGHERTY & BARRETT and JAMES DAMRON for appellant.

F. E. DAUGHERTY, Attorney General, and G. D. LITSEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

Appellant, Joe Jack, Jr., has been convicted of murder and sentenced to confinement in the state penitentiary for life by judgment of the Pike circuit court, and appeals.

It is urged that the indictment is fatally defective, and that appellant's demurrer to it should have been sustained. The indictment appears to be unnecessarily long and somewhat involved. Our consideration of it, however, has led to the conclusion that the demurrer was properly overruled. It charged appellant and W. H. Turner, Joe Jack, Sr., Hattie May Farley, and Margaret Turner with the crime of wilful murder. The accusatory part of the indictment was certainly definite, concise, and specific. It then proceeded to specify how the murder was committed. It charged in effect that the persons named conspired and agreed to kill a person unknown to the grand jury, and that while the conspiracy existed in

pursuance and furtherance of it some one or more of the conspirators did kill the unknown man by exploding powder, dynamite, or other high explosives, blowing him to pieces. It was further alleged that it was unknown to the grand jury in just what manner the explosion was caused, or who or how many of the conspirators were present and actually set off the blast. It further charged all of these things to have been done in Pike county, Ky., before the finding of the indictment, and to have been done by the persons named willfully, unlawfully, feloniously, and with malice aforethought. The indictment was good against all of the accused, since it charged that the unknown person was killed by some one or more of the conspirators, pursuant to and in furtherance of a conspiracy entered into by all to kill him.

It is insisted for appellant that the evidence is not sufficient to make the question of his guilt or innocence one for the jury, and that he was entitled to a peremptory instruction at the close of the testimony. These facts appear: Appellant's codefendant, W. H. Turner, was superintendent of the Alburn coal mine at McCarr, Ky. On March 24, 1924, he insured his life to the amount of $20,000; his wife, appellant's codefendant Margaret Turner, being designated as the beneficiary. On April 28, 1924, he insured his life in the sum of $30,000; his sister, appellant's codefendant Hattie May Farley, being designated as the beneficiary. This policy provided that, in the event insured should die from traumatic injuries, the result of an accident, $60,000 should be paid. Previous to this time he had taken a policy of insurance to the amount of $5,000 payable to his estate. The annual premiums on these policies amount to more than half of his annual income.

Appellant's codefendant Margaret Turner is the wife of his codefendant W. H. Turner. His codefendant Hattie May Farley is the sister of his codefendant W. H. Turner. His codefendant Joe Jack, Sr., is his father, and is also the father of Margaret Turner; so that this appellant is also the brother-in-law of his codefendant W. H. Turner, and the brother of his codefendant Margaret Turner. On the night of January 17, 1925, about 7 or 7:30 o'clock, W. H. Turner, in company with one Henry Wilson, is shown to have entered the Alburn mine and to have gone into a new haulway that had been cut, with a view to opening a new part of the mine for operations.

The purpose for which they entered the mine, as previouly expressed by them, involved the use of explosives, and powder, dynamite, and electric exploders were taken into the mine by them. Neither Turner nor Wilson returned to their homes that night, and on the following morning, between 9 and 10 o'clock, at the suggestion of the maid who worked for them, Mrs. Turner caused an investigation to be made to ascertain what had become of her husband and Mr. Wilson. A number of miners went to that portion of the mine where they had indicated they were to work, and found that an explosion had occurred. At the place of the explosion two dismembered bodies were found, both of which were so badly mutilated from the force of the explosion as to be wholly unrecognizable. A watch found on one of the bodies was identified as belonging of Mr. Wilson, and the remnants of that body were delivered to his family and buried as his remains. Nothing about the other body enabled those viewing it to identify it as W. H. Turner, but from the fact that he and Wilson had entered the mine together the previous night it was assumed by all of them to be his body. It was buried as such, and shortly thereafter his sister collected $60,000 on the life insurance policy on his life in which she was designated as the beneficiary. His wife collected the $20,000 on the policy in which she was designated as the beneficiary, and his administrator collected the $5,000 on the policy made payable to his estate.

Something like a year later W. H. Turner was recognized and apprehended in the city of New York. The record establishes that he left the mine after the explosion and went to Williamson, W. Va., where he boarded a train about 12 o'clock that night. He went immediately to the home of his sister, Hattie May Farley, who then lived in Detroit, Mich., and there saw and talked with her. Consequently it is established that, before she took any steps to collect the $60,000 of the insurance made payable to her, she had full knowledge that her brother had not been killed, but was still alive. The record is such that it is not to be doubted that his wife likewise had knowledge that he had not been killed, when she collected the insurance policy payable to her. The record details the extent of his wanderings from Detroit, where he went immediately to California, thence to Florida, thence to Trenton, N. J., thence to New York, and thence to Austria. He returned from the latter place to New York,

where he was recognized and apprehended. The evidence wholly fails to establish whose body it was that was thought to be that of W. H. Turner. No person is disclosed by the evidence to have been reported missing in or about this camp at that time. It is not altogether certain from the record that the other body in the mine was that of Henry Wilson.

The evidence as to the criminal connection of appellant, Joe Jack, Jr., with the death of the two persons whose bodies were found in the mine is largely circumstantial. A witness testified as to a conversation had with him at the close of the day on which the explosion occurred, and that appellant told him that he had been stringing wire in the newly opened portion of the mine that day. He was the electrician for the mine, and consequently knew how, by the use of copper wire, electric exploders, and electric current, to explode a charge of dynamite. A witness testified that about ten o'clock that night he saw appellant and his codefendant, W. H. Turner, come out of the hollow from the direction of the mine and go toward the West Virginia side. The furnace man at the company's commissary saw two men pass that building between 8 and 10 o'clock, who pulled their hats down and turned their faces away as they passed. For that reason he did not recognize them. Another witness saw appellant and his father, his codefendant Joe Jack, Sr., at 5 or 6 o'clock in the evening, in the former's automobile on the road from Red Jacket, where Joe Jack, Sr., lived, to the Alburn mine, and some time after 10 o'clock that night saw them return in the car to the home of Joe Jack, Sr. He also saw appellant the next morning about sunrise in the car on the road between Williamson and Matewan, W. Va. It was at Williamson that Turner boarded the train for Detroit about midnight of the night in question.

After the explosion Turner went from the mine to the garage, where appellant kept his car, and there changed clothes and went from there in a car to Williamson, W. Va., stating that Paul Tate drove the car. No one in the record seems ever to have heard of Paul Tate before or since. This was not a public garage. It is shown that, on the evening before W. H. Turner left to go to the mine, appellant came to his home, and that they and Mrs. Turner talked some time together there; that when Turner left to go to the mine appellant and Mrs. Turner

followed him to the yard, where they talked a few minutes; and that after Turner left appellant and Mrs. Turner continued to talk for some time together before returning to the house. On the following morning, about 9 o'clock appellant came again to the Turner home, and he and Mrs. Turner had a conversation together. Up to this time neither he nor Mrs. Turner had shown any signs of uneasiness because of Mr. Turner's failure to return, and the suggestion that a search for him or investigation of his failure to return should be made first came from the maid working for them. It was testified by one or more witnesses that appellant subsequently stated that he was out with his automobile all night of the explosion, and that he had badly damaged one of the running boards of his car. It was shown that on the day following the explosion the car was damaged as indicated.

It was established that, shortly after his codefendants had collected the proceeds of the insurance policies made payable to them, he purchased a restaurant and rooming house business in some town in West Virginia at the price of $1,700, and about that time deposited $500 in bank. A son of W. H. Turner testified that in May, 1925, following the explosion on January 17th, he and his father went to his aunt, Hattie May Farley, in Florida, and that while there she delivered to his father $10,000 of the money collected by her from the insurance company on his life, and that he (the witness) took that money from Florida to Trenton, N. J., and delivered it to his stepmother, Margaret Turner; that he then returned to Williamson, W. Va., and while there saw appellant, and in a conversation told him about taking the $10,000 to his stepmother in Trenton, N. J. He testified that appellant said to him:

"I will see if I can't get some more for the part I taken in the explosion; I only got about $2,200. and I should have more than that."

He further testified that a day or two later appellant left Williamson, W. Va., and went to Trenton, N. J., and when he returned appeared to have plenty of money, some of the bills being as high as $50 in denomination. Appellant, accounting for the money with which he paid for the business that he bought and which he deposited in the bank, stated that it was money which he had had for several years and which he and his wife had carried on

their persons, never having deposited it in bank. He admitted going to Trenton, N. J., as the witness testified he did, but stated that it was for another purpose. He denied having made the statement attributed to him by the witness, and ever having received any money from the proceeds of any of the insurance policies on the life of W. H. Turner.

Though a number of miners were at work in other parts of the mine, none of them heard the explosion, and the time when it occurred is not fixed by any fact or circumstance, further than that the watch found on one of the dead bodies stopped at 9:20 o'clock, and from that fact that is assumed to be the time of the explosion.

In view of these facts, this court is unable to agree with appellant's contention that there was not sufficient evidence to take the case to the jury on the question of his guilt or innocence. It is certainly sufficient to make it a question for the jury whether the conspiracy was entered into by appellant and his codefendants, and whether the unknown man was killed by appellant or others of the conspirators, pursuant to and in furtherance of it. Nor is it possible to conclude that the verdict of guilty herein is not supported by, but is flagrantly against, the evidence. The principles of law under which we reach these conclusions were fully written in Marcum v. Commonwealth, 212 Ky. 212, 278 S. W. 611, and Pharris v. Commonwealth, 198 Ky. 51, 248 S. W. 230, and numerous other opinions of this court referred to therein.

Appellant complains that the trial court erred in failing to instruct the jury under the provisions of section 241 of our Criminal Code of Practice relating to accomplices. Appellant's codefendant W. H. Turner was introduced as a witness by the commonwealth. Many of the facts and circumstances tending to establish appellant's criminal connection with the conspiracy and responsibility for the murder of the unknown man were testified to by Turner. The entire case for the commonwealth must fail unless it be believed that W. H. Turner was particeps criminis.

In view of the provisions of 241 of our Criminal Code of Practice it has uniformly been held by this court to be prejudicially erroneous, where the commonwealth introduces in evidence facts and circumstances tending to establish the guilt of an accused by the testimony of an accomplice, to fail to instruct the jury in the language

of that section that a conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and that the corroboration is not sufficient if it merely show that the offense was committed and the circumstances thereof.   See Craft v. Commonwealth, 80 Ky. 349, 4 Ky. Law Rep. 182; Patterson v. Commonwealth, 86 Ky. 313, 5 S. W. 387, 9 Ky. Law Rep. 485; Taylor v. Commonwealth, 8 S. W. 461, 10 Ky. Law Rep. 169; Kinney v. Commonwealth, 199 Ky. 202, 250 S. W. 854.   For this error upon the part of the trial court the judgment herein must be reversed.   It cannot be said, as appellant insists, that there was not sufficient evidence corroborative of that of the accomplice to take the case to the jury. .

It being necessary to reverse the judgment for the reason indicated, it is deemed unnecessary to discuss the effect of the trial court's refusal to permit the evidence of the absent witness taken upon a former trial to be read for defendant, and to discuss and determine the question raised by appellant's objection to portions of the argument of the attorney for the commonwealth, as these questions will not likely arise upon another trial.   Errors in the introduction of evidence were largely directed to the form of the question, it being insisted that in many instances they were leading and suggested the answer, and in some instances the point was well taken.   The attorney for the commonwealth will be guided by the fundamental rule that, while interrogating the witnesses for the commonwealth, the questions must not be leading or suggest the answer desired.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.