## Dority v. Commonwealth.

(Decided June 11, 1937.)

G. W. HATFIELD for appellant.

HUBERT MEREDITH, Attorney General, and J. M. CAMP-
BELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

The appellant, Leslie Dority, upon his trial under
an indictment of the McCreary county grand jury,
charging him with the murder of George Ross, was con-
victed of manslaughter and his punishment fixed at
fifteen years' imprisonment.

Numerous assignments of errors, alleged commit-
ted upon the trial, were set out by appellant in his mo-
tion and grounds for a new trial, which was overruled,
and four or five of which are here presented and in-
sisted upon by his appeal for a reversal of the judg-
ment.

The facts as disclosed by the record, and as very
fairly stated in appellant's brief, are that the deceased,
George Ross, and the defendant, Leslie Dority (here ap-
pellant), were miners, and in addition to such occupa-
tion the deceased, Ross, had for some time been also
operating a liquor store at his home near the mines at
Worley, McCreary county, Ky.

It appears further that at the time of the defend-
ant's admitted shooting and killing of the deceased,
Ross, he, together with one or two of his small chil-
dren, had been living and boarding at the home of the
deceased, who was his first cousin and brother-in-law
and who it also appears had been his intimate and long-
time friend.

The evidence is further that on the evening and
night before the defendant's admitted shooting and kill-
ing of the deceased, Ross, on the morning of December

7, 1936, Ross and his wife, together with the defendant and others, had gone over to a fair at Oneida, Tenn., returning therefrom about midnight. It appears that they all had been drinking somewhat during the evening, and that upon their return, the defendant retired, but that the deceased, together with a friend, Hasting Watters, left the house and went together in a truck over to Worley to make a "night of it," where it appears he continued to drink and returned home in an intoxicated condition about 7 or 8 o'clock the next morning; also, that when on their way back home, and shortly before reaching it, the deceased had drawn his pistol on his companion, Watters, because the latter had suffered the truck to strike a rut in the road, which resulted in somewhat jolting him; that upon the deceased's arrival at his home, he found his wife and children and the defendant, Dority, there and his wife preparing breakfast for the family, during which time the deceased sat in the living room with them, it is stated, in somewhat of a drunken stupor and quarrelsome mood, when he drew his pistol and fired it into the ceiling and his son's room above, thereby scaring his wife and children, who fled from the house to the refuge of the surrounding hills, where she found hiding. The deceased, when asked if his pistol had been accidentally discharged, replied: "Hell no, I did it on purpose."

It appears, further, that the deceased, soon realizing that his wife and children had run away, began to search for them, going to the homes of the nearby neighbors, and to the mining camp at Worley some two miles away, to look for and inquire about them. It appears that the negative replies of some of the parties inquired of angered the deceased and somewhat aroused his suspicion that they were misleading him, prompting his threat that "whoever lied to him was going to get hurt and get hurt bad;" that he soon returned to his home, not having found them, when he began, the defendant testified, to talk abusively to his son, Alva, who had not run away with his mother and the smaller children, and "ordered him to go and bring them back in fifteen minutes or he would come and kick him all the way back." Also, it appears that when Ross, in this alleged condition, had driven away in his truck in search of his wife, the defendant, apprehen-

sive for his safety, lest in his drunken condition he would drive off a cliff and be hurt, followed in the course he had gone, asking as to his whereabouts, and that, failing to overtake him, he returned to the house and entered its whiskey room.

Next following this, it appears, according to the testimony of defendant, the only eyewitness, the deceased came from the living room into the whisky room, where the defendant was standing, and asked him: "Where in the hell are they at?" To which he answered: "I don't know where they are at. They are around somewhere I guess." To which the deceased answered: "God damn you, you know where they are at. You are the cause of them leaving." To which the defendant states he again answered: "George, you know I am not the cause of them leaving;" that deceased then said, "Damn you, you are the cause of them leaving and I am going to kill you," and drew his gun on him and started through the partition wall door, and commenced punching him; also, that after striking at him with a gun, he hit at him with his gun, "glancing him upon the neck"; that just as deceased hit at him, he reeled around and staggered over towards him and threw his gun in the defendant's face, when defendant drew out his own gun and began shooting. Defendant states that the deceased had said he was going to kill him and that he shot to save his own life; that after shooting him five times, each shot striking him, one going through the head, he then went out on the porch and threw the shells out of his gun, after which, as the deceased was laying in the room on his face "kindly struggling," he went back to him and took him by the shoulder and pulled him over on his back; that he did not pick up deceased's gun or change it, or do anything to it at all, but left it as it fell, lying near his hand and body. Also, it was testified by an officer that there was found in the deceased's pistol barrel an empty shell, which, he stated, in an automatic gun of this character "hung it up and it wouldn't fire again," which, if so, would tend to explain deceased's failure to shoot the defendant after drawing or "throwing his pistol in defendant's face. After shooting the deceased, the defendant left and reentered the house a couple of times before any one else came, when he then went out in the road and hollered to some of the neighbors to go down

to the deceased's house and do something for him, after which he went over to Fred King's home, where he was later arrested.

The appellant, after making this somewhat lengthy statement of the facts of the case, here, by brief of counsel, discusses the evidence and insists that the verdict of the jury is not sustained by the evidence and is against the law and the evidence, and that there is not a line of incriminating evidence against the defendant nor a scintilla of proof that he was, at the time of his fatal shooting of the deceased, drunk or that his conduct at such time was other than that of any law-abiding citizen of the community, save for the fact that he was at the time carrying his pistol in a holster on his person.

Nowhere is it testified that there existed any ill feeling between defendant and deceased or that any words passed between them while spending the evening at the fair, or upon the deceased's return to his home the next morning, when he discharged his pistol about the breakfast table and scared off his family, or that any ill feeling whatever at any time had existed between them, notwithstanding he says deceased at this time cursed him and said he was the cause of his wife's leaving home.

Also, in support of the appellant's version of this shooting and killing, there is the undisputed evidence that the deceased had returned home after a night's carousal, much under the influence of drink and in a quarrelsome, dangerous, and fighting mood, which was shown by many witnesses to have been his general reputation when drinking.

We have carefully read and considered all the evidence and are led to conclude that the contention of the appellant, that the verdict of the jury was flagrantly against the evidence, is to be sustained, and in fact that all the evidence, both circumstantial and direct, was equally as consistent with the defendant's innocence as with his charged guilt. We have many times written that "a citizen should not be punished on mere suspicion." See Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. (2d) 34, 39, where the cases, among others, of Holmes v. Commonwealth, 218 Ky. 314, 291 S. W. 383; Forgy v. Commonwealth, 219 Ky. 177, 292 S. W. 799;

York v. Commonwealth, 235 Ky. 751, 32 S. W. (2d) 331; Slone v. Commonwealth, 236 Ky. 299, 33 S. W. (2d) 8; Moore v. Commonwealth, 229 Ky. 765, 17 S. W. (2d) 1021, are cited, holding to such effect.

There was here no direct, but only circumstantial evidence as to the facts and circumstances under which this shooting occurred, except for the report thereof as given by the defendant, who says that his shooting of the deceased was done in his necessary self-defense and only done after the deceased had punched him with his gun and "thrown" it in his face, at the same time swearing he was going to kill him.

There is much evidence tending to show that such was the drunken and dangerous mood of the deceased upon this morning of the shooting, which supports the defendant's claim that such continued to be his violent and fighting mood when he returned to his home, highly incensed and angered at his wife's having, in fright, run away to hiding and safety, after he had shot in the family midst when in the living room.

We are of the opinion that the commonwealth has here, by its evidence introduced, clearly failed to establish beyond a reasonable doubt that the charged crime was committed by the defendant, when it equally and as strongly appears that in his apparent necessary self-defense, as the appellant testifies, he shot and killed his cousin, the deceased.

The evidence, save for that given by the defendant himself in explaining and exculpating his admitted killing of the deceased, was wholly circumstantial. In the case of Marcum v. Commonwealth, 212 Ky. 212, 278 S. W. 611, 614, the court said:

> "It thus appears that the evidence introduced herein, tending to establish that a crime was committed when U. G. Johnson met his death, and that appellant, Riley Marcum, was the author of that crime, was wholly circumstantial. In Daniels v. Commonwealth, 194 Ky. 513, 240 S. W. 67, it was written:
>
> " 'The rule is thoroughly established in this jurisdiction that a conviction, even in murder cases, may be had upon circumstantial evidence alone, when it is of such force as to reasonably exclude every hypothesis of the defendant's innocence; and

that such evidence is often more conclusive and satisfactory in establishing the guilt of the accused than is positive and direct testimony. Smith v. Commonwealth, 140 Ky. 599, 131 S. W. 499; King v. Commonwealth, 143 Ky. [125] 127, 136 S. W. 147; Wendling v. Commonwealth, 143 Ky. 587, 137 S. W. 205; Peters v. Commonwealth, 154 Ky. 689, 159 S. W. 531; Mobley v. Commonwealth, 190 Ky. 424, 227 S. W. 584; Bowling v. Commonwealth, 193 Ky. [642] 647, 237 S. W. 381.'

"When the circumstances proved upon the trial of a case to establish the commission of a crime are as consistent with defendant's innocence as with his guilt they are held to be insufficient to reasonably exclude every hypothesis of defendant's innocence; and that has led to the following qualification of the rule, which is as well established as the rule itself:

" 'The rule that a conviction in a criminal case may be had upon circumstantial evidence alone is subject to the qualification that, if the evidence be as consistent with defendant's innocence as with his guilt, it is insufficient to support a conviction.' Chambers v. Commonwealth, 200 Ky. 295, 254 S. W. 906; Mullins v. Commonwealth, 196 Ky. 687, 245 S. W. 285; Daniels v. Commonwealth, 194 Ky. 513, 240 S. W. 67; Hill v. Commonwealth, 191 Ky. 477, 230 S. W. 910; Denton v. Commonwealth, 188 Ky. 30, 221 S. W. 202; 16 C. J. 763, sec. 1568, 8 R. C. L. 225, sec. 222."

The evidence adduced by the commonwealth, which was entirely circumstantial, when measured by such criterion, we conclude fails to make a case against the appellant, from which it follows that the verdict based thereon is flagrantly against the evidence, but inasmuch as it yet shows by the express admission of the defendant that he shot and killed the deceased, same was sufficient to support the court's refusal to grant a directed verdict, even though the judgment, we conclude, must be reversed upon the ground that it is flagrantly against the evidence.

Several other assignments of error are presented and argued by the appellant, but, in view of the conclusion we have reached as to the insufficiency of the

evidence to convict the appellant, we deem it unnecessary to here discuss or decide them and same are expressly reserved.

From this it follows that, for the reasons above indicated, the judgment herein is reversed and this cause remanded, for proceedings consistent herewith.

Judgment reversed.